772 So.2d 854 (2000)
STATE of Louisiana
v.
Ian A. CAZENAVE.
State of Louisiana
v.
Isaac Turner.
Nos. 00-KA-183, 00-KA-184.
Court of Appeal of Louisiana, Fifth Circuit.
October 31, 2000.
*855 Carey J. Ellis, III, Louisiana Appellate Counsel, Rayville, Louisiana, Attorney for Defendant/Appellant Ian A. Cazenave.
Martin E. Regan, Jr., New Orleans, Louisiana, Attorney for Defendant/Appellant Isaac Turner.
Paul D. Connick, Jr., District Attorney, 24th Judicial District, Parish of Jefferson, State of Louisiana, Terry M. Boudreaux Appellate Counsel, Alison WallisCounsel of record on Appeal, Joan BengeTrial Counsel, Assistant District Attorneys, Gretna, Louisiana, Attorneys for Appellee State of Louisiana.
Panel composed of Judges CHARLES GRISBAUM, Jr., JAMES L. CANNELLA, JJ., and JAMES C. GULOTTA, J. Pro Tem.
CANNELLA, Judge.
Defendants, Ian Cazenave (Cazenave) and Isaac Turner (Turner), appeal from their convictions of second degree murder and sentences. We affirm and remand.
On November 6, 1998, Cazenave and Turner were indicted for the first degree murder of Rodney "Cardell" Robinson (Cardell), who died of a gunshot wound to his upper buttock/lower back on March 15, 1998, a violation of La. R.S. 14:30. The State amended the charges to second degree murder. Following a jury trial on June 17, 18, 21, and 22, 1999, the Defendants were convicted as charged and sentenced to life imprisonment at hard labor, without parole, probation, or suspension of sentence.
On appeal, Defendants assert that the evidence was insufficient to support the verdicts of second degree murder.
On March 15, 1998, at approximately 9:00 p.m., Turner, also known as "Nuni," arrived by car at the home of Janice Martin (Martin) in Kenner, Louisiana. Cardell was on the front porch of the house talking with Darrell Moss (Moss), also known as "head", and Patrice Wiggins/Conway (Patrice). Following a discussion between Cardell and Turner, Turner shot Cardell. Turner does not deny shooting Cardell, but claims he did it in self-defense after Moss told Cardell to shoot him. According to Turner, he grabbed the gun held by the victim and stumbled in the grass, accidentally discharging the weapon. Turner denied that he intended to kill Cardell. He stated that, when he left the scene *856 after shooting Cardell, he did not believe that Cardell was seriously injured. However, other witnesses testified that Turner was the only person with a gun and that he killed Cardell after Turner attempted or completed a drug-related robbery of Cardell.
Shawhna Conway (Shawhna), Patrice's daughter and the niece of Turner and his wife, Tracy Turner (Tracy), was 13 years old at the time of the shooting and lived with Martin across the street from Patrice's residence. Both Cardell and Moss were friends of her mother. Shortly before the shooting, as Shawhna returned from a fast food restaurant, she saw a car belonging to Turner and Tracy parked on the street, across from a neighbor's house belonging to Larry Robinson (Robinson), also known as "Funk". Shawhna testified that she looked into the car and saw Turner and Cazenave. Shawhna stated that Cazenave, her mother's former boyfriend, was driving. Shawhna also claimed that she saw a gun on the backseat, but she could not describe it. As she passed the car, Turner got out and walked across the street. She followed him, calling, "Hey, Uncle Nuni." Shawhna said that Turner looked at her but did not say anything.
Shawhna testified that Cardell and Moss walked across the street and spoke to Turner, who asked Cardell for a "dime," which is a rock of cocaine. As Cardell started to give one to him, Turner indicated that he wanted all of the rocks. When Cardell asked what Turner meant, Turner, the only person in the group with a gun, pulled out the gun from under his shirt. Shawhna stated that Cardell tried to turn around and Turner shot Cardell in the back. Moss ran from the scene. Shawhna testified that she did not recall the color of the gun, but thought that it was silver. She continued to stand where she was when the shooting started and saw Turner run to the car, turn back and fire again. At that point, Cazenave reached over the front seat to unlock the back door of the car and Turner jumped or dived in. The car then quickly sped away.
Shawhna testified that after the shooting she ran by Robinson's house where she continued to watch the events. She also said that she ran inside and called Tracy, asking her if Turner was home. Tracy told her that he was not home. She said that she called Tracy a second time and asked her if she knew that Turner shot Cardell. Tracy said she did not and claimed that Turner was sitting at home. According to Shawhna, Tracy lied because Turner could not have arrived home that quickly because their house was in New Orleans.
According to Patrice, she was seated on her porch with Cardell and two other adults when she saw Shawhna and Turner come up the street. Patrice noticed the car only after it was parked. When she saw Turner, Patrice asked him if Cazenave was in the car. He told her "yes" and she went over to the vehicle to speak to him. She testified that when she put her head through the open window, Cazenave was acting strangely, telling her to get away from the car. He cursed and said, "Get away from the f____ car." She thought that he was high, but spoke to him anyway while he continued to curse. She said that Cazenave was watching Turner through the driver's side rearview mirror. About three times Cazenave told Patrice to get away. He did not tell her what he was doing there. The car engine was running.
Shawhna also testified that her mother spoke to Cazenave and that Cazenave kept telling Patrice to get away from the car. Shawhna added that Cazenave said that he was about to do something.
Patrice testified that she saw an AK-47 with a banana clip on the front seat near Cazenave. She stated that the gun was partially covered with a towel or similar covering. Patrice said that she could identify the gun because her parents were in the military and she was familiar with guns. When she saw the gun, she told Cardell to run and then she heard two *857 gunshots. She saw Cardell jump up holding his eye, and then watched as he rolled on the ground yelling.
At first, Patrice thought that her daughter was dead. When the shooting took place, her daughter, Cardell, Moss, and Turner were in front of Robinson's house. Patrice said that she screamed out her daughter's name, but her daughter did not answer. Patrice stated that Turner was the only person that she saw with a gun in his hand after the shots were fired and that he ran past her with a gun in his hand. She testified that after Turner jumped into the car, it drove away with a screeching sound.
Shawhna testified that after Cardell fell to the ground, Turner reached down, removed money from Cardell's pocket and some rocks of cocaine from his hand. At that point, she ran away. Patrice did not see the robbery, Turner reach toward the ground or Cardell after the shooting.
Shawhna and Robinson testified that Robinson and Patrick Jackson (Jackson) dragged Cardell inside after the shooting. Patrice said that she and Jackson brought Cardell into the house. Patrice stated that Robinson, Cardell's uncle, was in shock at the time.
Patrice said that Cardell told them that Turner shot him. Robinson also testified that Cardell said "Nuni" shot and robbed him. He explained that Cardell spoke in a low voice and he heard his nephew by placing his head downward toward his nephew's head. He said that Cardell did not have a gun, rocks, or any money on him. Robinson later identified Turner as "Nuni" in a photographic lineup.
Although Robinson did not see Shawnha outside after the shooting, he was focused on his dying nephew. Although there were other people outside his doorway or in the doorway while they waited for the police, he did not know who was there. He said that there was confusion and some people were crying.
After the shooting, Patrice tried unsuccessfully to find Shawhna. Patrice said her daughter disappeared. Patrice testified that she heard people saying her daughter was shot. Patrice searched for Shawhna for 10 to 20 minutes and finally located her in an upstairs closet in Martin's apartment. One of the officers on the scene, Officer Mark Russo, testified that he responded to the shooting approximately one minute after the incident and that he spoke to Shawhna, who was on the side of the building.
In contrast to the testimony of Patrice and Shawhna that Shawhna was near the scene of the shooting, Moss and Turner testified that, although Patrice and Shawhna were present that night, Shawhna was not standing with or near the men. Turner claimed that Patrice and Shawhna were sitting in the car with Cazenave. However, Moss agreed with Patrice's testimony that she went over to the parked car and that the engine was running.
Moss testified that he saw Turner standing by some bushes in front of Robinson's home. Turner called to Cardell, asking him for four "big 20's," meaning drugs or rocks. Moss said he went with Cardell to where Turner was standing. Cardell reached in a bag for the drugs and gave Turner four "20's." According to Moss, Turner pretended that he was paying for them, but instead pulled a gun, telling Cardell to give him all of the drugs. Cardell, backing away, told Turner not to do this. Moss heard gunfire, then he ran. He did not know if Turner approached Cardell and took anything out of Cardell's hand or out of Cardell's pockets after the shooting. Moss stated that neither he nor Cardell had a gun.
During Moss's testimony, it was determined that he had previously lied to the grand jury by denying that Cardell was carrying drugs. Moss explained that he was afraid that his probation would be revoked and the grand jury would not accept the case if it were drug related.
*858 Turner testified in his own defense. He stated that he and Cazenave went to the area at Patrice's request, for the purpose of an attempted reconciliation between Cazenave and Patrice. According to Turner, when he and Cazenave arrived, Patrice and Shawhna ran to the car. As they approached, Cardell called to Turner, asking him if he forgot about a $30 gambling loan. Turner knew both Moss and Cardell. Turner said that he did not recall the loan. He told Cardell, "I ain't paying you shit, bra. I'm about to blaze," meaning that he was about to leave. (R., Vol.III, 183, p. 578). Turner claimed that Moss then told Cardell to "Shoot that nigger." (R., Vol.III, 183, pp. 578-579). Cardell moved to retrieve a gun that was in his waistline in his clothing. Turner saw the gun for the first time when Cardell reached for it. Turner said that he "pulled" the gun from Cardell as Cardell went into a "spin move," meaning that Cardell tried to spin away from Turner. He demonstrated to the jury the "spin move". Turner insisted that Cardell did not turn his back to Turner before being shot, but was turning away in order to pull his gun and shoot Turner. Turner described his own actions as "pulling back and the gun going off." Turner said that Cardell saw Turner reaching for the gun and that he had to reach around Cardell to get it. At first he said that he actually fired the gun, then said it was hard to tell if he pulled the trigger or if the gun went off accidentally because when he got the gun, he backed away and stumbled in some grass. That is when the gun went off. Turner testified that Cardell was turning sideways at the time. He insisted that he did not intend to shoot Cardell and that his actions were in self-defense because he thought that Cardell was going to shoot him and he knew his life was in danger.
During these events, Turner looked to see if Moss had a gun, but Moss was running away from the scene. Turner realized that Cardell was shot in the buttock, so he walked back to his car, thinking that Cardell was going to be alright. He testified that he did not "dive" into the car, but got into the front seat in a normal manner. He claimed that Patrice was sitting in the front passenger seat talking to Cazenave and that Shawhna was leaning on the opened passenger side front door.
Turner thought that he had not done anything. He said that he had been afraid because Cardell pulled a gun on him and attempted to shoot him. He said that he did not intend to kill Cardell and thought that the shot in the buttock area was sufficient punishment. Turner testified that he was trained in the military and had he wanted to kill Cardell he could have done so. He stated that he wished he had remained at the scene because of the accusation that he robbed Cardell, which he denied. He also denied going to the area for the purpose of finding Cardell or killing him. He denied firing a second shot. He claimed that no one in the neighborhood came forward to tell the truth because the people were afraid.
The gun was not recovered. After leaving the scene, Turner threw the gun out of the car because he was frightened. Turner said that he tried to tell the police that he shot Cardell in self-defense, but the arresting officer slammed his hand on the desk and told Turner that he had five witnesses. Turner did not feel the officer wanted to hear the truth.
Shawhna testified that she did not recall Cardell asking Turner about money which Turner owed him, although Turner borrowed rocks and money from Cardell in the past. In response to the testimony of Shawhna and Patrice, Turner claimed that Shawhna and Patrice did not have a good relationship with him and had previously lied about him.
Cazenave's sister-in-law, Greta Cazenave, testified that Cazenave resided in her home at the time and that Cazenave was present in the home until 9:00 p.m. the evening of the shooting and that he was present in the house the following morning.[1] *859 Turner testified otherwise. According to Turner, Cazenave resided with Turner and Tracy during the relevant time period and Cazenave drove Turner to the scene. Shawhna and Patrice also testified that Cazenave drove the car and that Cazenave was living with Tracy at the time of the incident.
Cazenave, who did not testify, presented evidence that he was a mere bystander and did not participate in the commission of the crime. Turner testified that Cazenave, who remained in the car, was unaware of the shooting. He said that Cazenave only drove off after Turner told Cazenave that some people tried to shoot him.
Officer Russo arrived at the scene shortly after the shooting. He testified that he heard people at the scene say that a black female was driving the car. Detective Pepiton related that Moss told him that Turner said that a black female was possibly driving the car, but Moss never saw the driver. Moss thought that the driver was Patrice's sister because Cardell yelled something upstairs about her sister. Sergeant William Mouret stated that Moss told him a black female was driving the vehicle, but pointed out Patrice at the scene, explaining that the car belonged to her sister. Sergeant Mouret instructed Officer Russo to interview Patrice, who told him that Cazenave was the driver of the car. Shortly thereafter, the police concluded that Cazenave drove the car following the shooting.
Dr. Susan Garcia, the forensic pathologist who performed the autopsy, testified that a bullet went from Cardell's back toward the front, from his right to his left side and slightly upward. She testified that the gun was shot from behind Cardell and to his right. The angle of the gun could have been horizontal to the entry wound or slightly beneath it. She classified the death as a homicide.
The standard for appellate review of the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); State v. Abercrombie, 375 So.2d 1170, 1177-1178 (La. 1979), cert. denied, Abercrombie v. Louisiana, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980); State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722, (1998); State v. Barnes, 98-932 (La.App. 5th Cir. 2/10/99), 729 So.2d 44, 46, writ denied, 99-1018 (La.9/17/99), 747 So.2d 1099.
Under Jackson, a review of a criminal conviction record for sufficiency of evidence does not require a court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Barnes, 729 So.2d at 46. A reviewing court is required to consider the whole record and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. It does not "serve as a vehicle for a reviewing court to second guess the rational credibility determinations of the fact finder at trial." State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291, 1293.
La. R.S. 14:30.1A(l) provides that second degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. In order to prove second degree murder, the State must prove (1) the killing, and (2) specific intent to kill or inflict great bodily harm. Id.; State v. Williams, 97-1135 *860 (La.App. 5th Cir. 5/27/98), 714 So.2d 258, 263; Barnes, 729 So.2d at 46.
Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). The determination of specific criminal intent is a question of fact. State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, 373, cert. denied, Seals v. Louisiana, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Lewis, 97-160 (La.App. 5th Cir. 7/29/97), 698 So.2d 456, 459. Specific intent may be inferred from the circumstances and the actions of the defendant. Seals, 684 So.2d at 373; Lewis, 698 So.2d at 459. Flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer guilty conscience. State v. Fuller, 418 So.2d 591, 593 (La. 1982).
Turner contends that the shooting was committed in self-defense. La. R.S. 14:20 provides that a homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger....
When a defendant claims self-defense, the state must prove beyond a reasonable doubt that the defendant did not act in self-defense. Barnes, 729 So.2d at 46. In Barnes, we stated further:
The relevant inquiry on appeal is whether a rational fact finder, after viewing the evidence in the light most favorable to the prosecution, could have found, beyond a reasonable doubt, that the homicide was not committed in self-defense. The determination of Defendant's culpability focuses on a two-fold inquiry, whether, from the facts presented, Defendant could reasonably have believed his life to be in imminent danger, and whether deadly force was necessary to prevent the danger. While there is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a Defendant had a reasonable belief that deadly force was necessary to avoid the danger.

Barnes, 729 So.2d at 46 (citations omitted)
Under La. R.S. 14:21, an aggressor cannot claim self defense. The statute states:
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
Turner contends that the jury's verdict was irrational when considered in light of the alleged conflicting testimony of the State's witnesses, the lack of physical evidence, and the circumstances of the shooting. He contends that the evidence at most only supports the responsive verdict of manslaughter, which is committed in sudden passion or without intent to cause death or great bodily harm. See: La. R.S. 14:31. Cazenave also argues that the testimony of the witnesses was inconsistent.
When the trier-of-fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. State v. Jiron, 96-319 (La.App. 5th Cir. 10/1/96), 683 So.2d 769, 771; State ex rel. Graffagnino v. King, 436 So.2d 559, 563 (La.1983). It is not the function of the appellate court to assess the credibility of witnesses or re-weigh the evidence. State v. Styles, 96-897 (La.App. 5th Cir. 3/25/97), 692 So.2d 1222, 1233, writ denied, 97-1069 (La.10/13/97), 703 So.2d 609; King, 436 So.2d at 563.
Contrary to Turner's assertion there was no physical evidence, the results of the autopsy showed that the gun responsible *861 for the death was fired from behind and to Cardell's right and that he died as a result of the gunshot wound to the buttock. Thus, the evidence supports a finding that Cardell was shot in the back, not while he was turning.
Turner next points to inconsistencies between the testimony of Shawhna and Patrice, that Patrice, unlike Shawhna, did not see him take the rock out of Cardell's hand and take money from Cardell's pocket. However, the testimony establishes that Shawhna and Patrice were at different vantage points. Shawhna was near the three men. Patrice, on the other hand, was near the car speaking to Cazenave.
Cazenave argues that Shawhna and Patrice inconsistently testified about the location of a gun in the car, and neither testified that he held, controlled, or used the weapon. However, they consistently testified that there was a gun in the car. Cazenave further argues that Shawhna could not describe the gun and yet Patrice was positive that the gun was an AK-47 with a banana clip.
Shawhna had difficulty describing the weapon, while Patrice gave a more precise description based on her knowledge of weapons. Thus, the jury could have reasonably inferred that Patrice's description was more accurate based on her knowledge of guns. Further, since neither witness was at the location of the car at the same point in time, the jury could have reasonably inferred that Cazenave changed the location of the gun between the time the gun was first seen by Shawhna and then later seen by Patrice. Under either scenario, the gun was accessible to Cazenave. At any rate, Cazenave was not identified by anyone as the robber or the shooter. Thus, the precise placement of the gun during the entire event and its detailed description are not determinative of whether Cazenave was a principal.
Turner also notes the discrepancy between Patrice's testimony and Robinson's testimony about who dragged Cardell into Robinson's house and Patrice's knowledge of Cardell's involvement in a drug sale that evening. Patrice admitted that she was aware of the drug involvement that evening, but denied having personal knowledge that Cardell was involved in prior drug transactions. She explained that she has a job and is frequently not at home. She suggested that Shawhna would be more knowledgeable about the drug activities in the area.
These inconsistencies do not seriously question the credibility of the witnesses. Patrice admitted knowledge of Cardell's involvement in drug activity that day. Whether Patrice or Robinson dragged Cardell or whether Patrice had knowledge of Cardell's activities prior to the shooting were not determinative of any element of the offenses. These inconsistencies were heard by the jury and they evidently found the testimony sufficiently consistent and credible with regard to proof of the elements of the offenses charged.
Turner also notes that Moss, who admittedly lied to the grand jury, testified that Cardell had a bag in his hand and that he reached into the bag to hand the rocks of cocaine to Turner. However, no other witness mentioned the bag. Although Moss also stated that no one else was around when he, Cardell, and Turner were standing together, Turner argues that these facts, coupled with the absence the next day of any rocks or gun found on Turner, do not support the conclusion that an armed robbery occurred. Cazenave further points out that Moss stated that Moss, Cardell and Turner were the only three persons present when the shooting occurred and that Shawhna was not present.
Turner contends that the lack of evidence from the search is a factor supportive of the insufficiency of evidence. However, Turner admitted throwing the gun from the car when he left the scene. The absence of rocks after the incident, while it may have been a corroborative fact, does *862 not negate the taking of the rocks during the offense itself.
Moss admitted that he lied under oath to the grand jury when he denied that Cardell was carrying drugs. He explained that he feared his probation would be revoked and Turner would avoid prosecution. Moss's bias and perjury were heard by the jury.
In State v. Bender, 598 So.2d 629, 636 (La.App. 3rd Cir.1992), writ denied, 605 So.2d 1125 (La.1992), the court stated:
When a witness is impeached, this simply means the jury, as the trier of fact, was presented with evidence which it could consider and weigh in determining the credibility, or believability, of a witness. Simply because the witness may have been impeached by prior inconsistent statements does not mean that the jury was prohibited from believing anything said by the witness. The inconsistencies in the witness's statements are one of any number of factors the jury weighs in determining whether or not to believe a witness's trial testimony.
See also: State v. Hotoph, 99-243 (La. App. 5th Cir. 11/10/99), 750 So.2d 1036, 1045.
Thus, the jury, in making its credibility determinations, could have rejected Moss's testimony in whole or in part. Since Moss was not the sole witness who testified about the drugs, the jury could have accepted this testimony. On the other hand, it could have rejected his testimony that Shawhna was not near the men when the shooting occurred. Both Shawhna and Patrice testified that Shawhna was present during the encounter between Cardell and Turner.
The inconsistencies in the testimony do not cast doubt on the verdict. Robinson, Shawhna and Moss all testified that Turner shot the victim during a drug encounter. Shawhna testified that Turner robbed the victim of both the cocaine and money in Cardell's pocket after Cardell fell to the ground. Moss witnessed Turner, at gunpoint, ordering Cardell to give him the drugs. Robinson and Patrice stated that Cardell told them that Turner shot and robbed him before losing consciousness. Thus, the inconsistencies cited by Cazenave and Turner were resolved by the evidence as a whole.
Turner also contended that the gun discharged accidentally or in self-defense. He also argues that the jury instructions show that the State intended to disregard armed robbery as a theory of the case. He contends that the jury found him guilty based on the finding of specific intent, which was not shown.
La. R.S. 14:30.1 provides in part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2)(a) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnaping, second degree kidnaping, aggravated escape, drive-by shooting, armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.[2][Emphasis added]
The record does not support Turner's assertion about the jury instructions. The jury requested additional instructions on second degree murder, manslaughter, and what constitutes a principal to a crime. It did not ask for an instruction on only second degree murder. The jury also requested the judge to re-read Shawhna's testimony regarding the money owed Cardell because of previous purchases of cocaine. However, the trial judge refused *863 and only re-read the jury instructions and the requested charges on the offenses. The transcript contains a discussion indicating that he included the felony-murder theory.
In addition, the jury clearly rejected Turner's version of the events. As we have stated previously, it is not the function of this Court to re-weigh the evidence or make credibility determinations. We must follow the Jackson standard in reviewing the evidence. In this case, after viewing the evidence in the light most favorable to the prosecution, we find that any trier of fact could have found the essential elements of the crime of second degree murder by Turner beyond a reasonable doubt.
In Cazenave's arguments, he contends that the State failed to prove that he had the specific intent to kill or to inflict great bodily harm in order to convict him as a principal to the crime, under La. R.S. 14:30.1A(1). He further argues that the State failed to meet its burden of proving that he was a principal to second degree murder under R.S. 14:30.1A(2)(a), the felony-murder provision.[3] He argues that (1) Shawhna was the only witness who testified that Turner took cocaine from Cardell, (2) Patrice did not see the alleged robbery, (3) Moss, who stood immediately beside Cardell, did not see a taking, (4) Moss was the only person who testified crack cocaine was being sold by himself and Cardell, (5) neither Shawhna nor Patrice testified that he held, controlled, or used the weapon, and (6) Robinson testified that Cardell identified Turner as the robber and not him.
La. R.S. 14:24 defines principals as,
"All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals."
In State v. Cedrington, 98-253, pp. 14-15 (La.App. 5th Cir. 12/16/98), 725 So.2d 565, 573, writ denied, 99-0190 (La.6/4/99), 743 So.2d 1249, writ denied, 99-0431 (La.6/25/99), 745 So.2d 1182, we stated:
Second degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1 A(1). The crime is also defined as the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of one of the felonies (in this case aggravated burglary). LSA-R.S. 14:30.1 A(2)(a). One need not possess specific intent to kill or inflict great bodily harm to be a principal to a second degree felony murder. See State v. Dunn, 94-776, p. 9 (La.App. 5th Cir. 2/15/95), 651 So.2d 1378, 1388-1389.
We have already determined that the State met the Jackson standard in proving the elements of either second degree murder under R.S. 14:30.1A(1) or (2)(a). Furthermore, both Shawhna and Patrice related that Cazenave was the driver of the car and that he kept the engine running during Turner's encounter with Cardell. They testified that he watched the incident through the rearview mirror and repeatedly told the women to get away from the car. He had an AK-47 gun readily available to him. In addition, he sped away from the scene without attempting to aid Cardell. La. R.S. 15:438 provides that when evidence is circumstantial, the applicable rule is, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." Based on these facts, the jury could have determined that the circumstantial evidence excluded the reasonable hypothesis *864 that Cazenave was an innocent bystander, but knew that Turner intended to commit an armed robbery. Thus, viewing the evidence in the light most favorable to the prosecution, we find that any trier of fact could have found Cazenave guilty of being a principal to the crime of second degree murder beyond a reasonable doubt.

ERROR PATENT
La.C.Cr.P. art. 920 provides: "the following matters and no others shall be considered on appeal: (1) An error designated in the assignments of error; and (2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."
For the purpose of an error patent review the "record" in a criminal case includes the caption, the time and place of holding court, the indictment or information and the endorsement thereon, the arraignment, the plea of the accused, the bill of particulars filed in connection with a short form indictment or information, the mentioning of the impaneling of the jury, the minute entry reflecting sequestration in a capital case, the verdict, and the judgment or sentence. State v. Oliveaux, 312 So.2d 337, 339 (La.1975); State v. Boudreaux, 95-153 (La.App. 5th Cir. 9/20/95); 662 So.2d 22, 28.
In advising Cazenave and Turner of the prescriptive period for post-conviction relief, the trial judge informed them that the prescriptive period for post-conviction relief was three years from the date the conviction and sentence become final, as required by La.C.Cr.P. art. 930.8. At the time of the sentencing, La.C.Cr.P. art. 930.8 provided a three year period for post conviction relief. However, effective August 15, 1999, the article was amended to shorten the period to two years. See: 1999 La. Acts 1262.[4]
We held in State v. Boles, 99-662 (La. App. 5th Cir. 11/10/99), 750 So.2d 1059, 1062, that the amendment should be applied retroactively and that a defendant, who was not informed of the prescriptive period for post-conviction relief, should be informed that the prescriptive period is two years. Compare: State v. Dickerson, 99-353 (La.App. 5th Cir. 1/28/00), 751 So.2d 425. In Boles, we stated that the application of the amended prescriptive period in a defendant's case would not violate ex post facto prohibitions, as the article itself does not relate to an offense or its punishment. Boles, 750 So.2d at 1062. Therefore, we will hereby order the trial court within ten days of the rendering of this opinion to send written notice to Cazenave and Turner of the amended prescriptive period and to advise them of when the period begins to run, and to file written proof in the record that they received said notice.
Accordingly, we hereby order the trial court to send to Cazenave and Turner, within ten days of the rendering of this opinion, written notice of the amended prescriptive period for post-conviction relief and notice as to when the period begins to run. The trial judge is further ordered to file written proof in the record that they received the notice.
The convictions and sentences of Cazenave and Turner are otherwise hereby affirmed.
*865 CONVICTIONS AND SENTENCES AFFIRMED; REMANDED.
NOTES
[1] Shawhna testified that the incident occurred between 10:00 p.m. to after 11:00 p.m. However, Patrice and Detective Keith Pepiton testified that the incident occurred around 9:00 p.m. Officer Alan Abadie recovered a spent casing, the only casing found, under a bush in the 300 block of Clemson Street at 10:03 p.m.
[2] La.R.S. 14:30.1B states: Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
[3] Armed robbery, the felony relied upon by the State, is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:64.
[4] The amended article provides, in pertinent part:

A. No application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of Article 914 or 922, unless any of the following apply:
* * * * * *
(3) The application would already be barred by the provisions of this Article, but the application is filed on or before October 1, 2001, and the date on which the application was filed is within three years after the judgment of conviction and sentence has become final.