DO NOT PUBLISH

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

07-931

STATE OF LOUISIANA

VERSUS

GARY LAFLEUR

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 04-K-5581-C
HONORABLE ALONZO HARRIS, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

J. DAVID PAINTER

\*\*\*\*\*\*\*\*\*\*

Court composed of Glenn B. Gremillion, Elizabeth A. Pickett, and J. David Painter, Judges.

**AFFIRMED.**

Dmitre I. Burnes
Attorney at Law
P.O. Box 650
Alexandria, LA 71301
Counsel for Defendant-Appellant:
    Gary LaFleur

Earl B. Taylor
District Attorney-27th Judicial District Court
Jennifer M. Ardoin
Assistant District Attorney-27th Judicial District Court
P.O. Box 1968
Opelousas, LA 70571
Counsel for Appellee:
    State of Louisiana

PAINTER, Judge.

Defendant, Gary LaFleur, appeals his conviction for second degree murder. For the following reasons, we affirm the conviction and the sentence imposed in connection therewith.

FACTS AND PROCEDURAL HISTORY

On the evening of December 24, 2004, Defendant went to the home of Dwain Andrepont in Eunice, Louisiana. Defendant struck the victim several times on the head with a tire iron and stabbed him several times in the chest and abdomen. The victim died as a result of the injuries.

Defendant was charged by a bill of indictment with second degree murder, a violation of La.R.S. 14:30.1. A jury trial began on March 6, 2007, and on March 14, 2007, Defendant was found guilty as charged. He waived all delays and was sentenced on the same date to life imprisonment without the benefit of probation, parole, or suspension of sentence.

Defendant has perfected a timely appeal. He alleges three assignments of error: 1) The State failed to sustain its burden of proving beyond a reasonable doubt that he was not acting in self-defense; 2) The trial court erred when its instruction to the jury failed to give a complete and accurate definition of the offense of manslaughter; and 3) The State improperly argued to the jury that they should consider whether Defendant could have retreated when determining if he had a reasonable belief deadly force was necessary.

DISCUSSION

*Self-Defense*

1

Defendant does not deny that he repeatedly struck the victim with a tire tool and stabbed him several times or that the victim died as a result of the injuries. However, Defendant argues that the victim initially attacked him with a knife in a drunken rage and that he was forced to defend himself.

In his brief on appeal, Defendant asserts that the State failed to sustain its burden of establishing beyond a reasonable doubt that he did not act in self-defense. As noted by Defendant, the State presented no eyewitnesses to the crime. As a result, the State had to rely upon circumstantial evidence to defeat the assertion of self-defense.

The standard of review in a circumstantial evidence case is well established in Louisiana jurisprudence:

> In reviewing the sufficiency of the evidence to support a conviction, an appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984). Further, when the conviction is based upon circumstantial evidence, LA.REV.STAT. ANN. § 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984); *State v. Wright*, 445 So.2d 1198, 1201 (La.1984). However, LA.REV.STAT. ANN. § 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt standard; it is merely an evidentiary guide for the jury when considering circumstantial evidence. *State v. Porretto*, 468 So.2d 1142, 1146 (La.1985).

*State v. Manning,* 03-1982, p. 46 (La. 10/19/04), 885 So.2d 1044, 1088, *cert. denied*, 544 U.S. 967, 125 S.Ct. 1745 (2005).

Defendant was charged with second degree murder, a violation of La.R.S. 14:30.1, which, in pertinent part, provides:

A. Second degree murder is the killing of a human being:

2

(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

(2)(a) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he had no intent to kill or to inflict great bodily harm.

Justifiable homicide is defined as:

When committed in self-defense by one who reasonable believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

La.R.S. 14:20(A)(1).

At trial, Defendant testified as follows: Defendant, who was twenty-seven at the time of the incident, stated that he and his then eleven year old son, Phillip, were living with his girlfriend, Ashley Leger. He was working the day of Christmas Eve at his father's furniture store. He, a co-employee, Rodney Cormier, and his son delivered a recliner to the house of the victim. On the way to the victim's house, he stopped at a pawn shop because he was supposed to purchase a rifle he had seen there as a Christmas gift for his son. However, he and the boy were informed that the gun had been sold. They then went to the victim's house.

Defendant testified that he had never met the victim before that day. When they arrived, the victim's mother was there. While delivering the recliner, he saw hunting trophies and asked what kind of gun the victim used. The victim told him he had a rifle for sale. Defendant stated that after he saw the rifle, he decided to buy it for his son and asked if he could pass back with the money.

Defendant testified that after the store closed, he and Phillip went to the victim's house and purchased the rifle for one hundred and forty dollars. The victim

3

showed them how to operate the rifle and gave them two magazine clips and a box of bullets. Thereafter, Defendant, Phillip, and a young friend of Phillip's went out to a field and fired off three or four rounds. Later, in the evening, Defendant's girlfriend came home with their seven-week-old daughter and her parents. At that time, his girlfriend told him he could not keep the rifle because she did not think the boy was responsible enough and they had a baby in the house.

Defendant reluctantly agreed, and he and Phillip drove back to the victim's house to return the rifle. Phillip stayed in the truck while Defendant went into the house. Defendant testified that the victim first accused him of messing up the rifle and then stated that he did not want to buy back the gun. He stated that the victim was very rude and that he was drinking. The victim called someone and asked the person if he wanted to buy the rifle, but apparently the person did not have the money. The victim then agreed to buy back the rifle, but he would only pay fifty dollars. However, Defendant had forgotten to bring the box of bullets and the victim refused to pay him the fifty dollars until he returned the bullets. Defendant testified that he went home, got the box of bullets, and went back to the victim's house. However, he left his son at home.

Defendant testified that because the victim had been acting funny, he grabbed a tire tool out of the truck and tucked it into his pant leg before he went into the house. He stated that the victim was drinking whiskey and smoking marijuana. He said that the victim said he did not want to buy back the rifle, but when Defendant said that he would take the rifle and go, the victim refused to allow him to take the gun. When Defendant insisted that he was going to take the rifle and leave, the victim walked into the kitchen and came back with a kitchen knife and attacked him,

4

cutting him across the knuckles. Defendant testified that he struck the victim several times with the tire iron while the victim held onto him and tried to stab him. He stated that he twice bit the victim on the shoulder in an effort to get him to let go. During the scuffle, he dropped the tire iron. Defendant testified that at some point, he gained control of the knife and, without realizing what he was doing, began stabbing the victim. He stated that when he realized what had happened, the victim was on the floor. Defendant stated that he panicked and ran around the house looking for the bathroom, which was through the victim's bedroom, to wash off the blood. Leaving the rifle, the bullets, and the tire iron, he ran out the back door, jumped the backyard fence, and ran around to get into his truck. A short distance later, he realized that he still had the knife handle in his hand and threw it out the truck window.

When he got home, he went into the bathroom to clean up. He testified that his girlfriend came into the bathroom and thought he had been shot because there was so much blood. He stated that he threw up several times, then got into the bathtub. Later, he put his shirt, pants, and shoes into a bag and threw the bag into a bayou close to his house. Defendant stated that when the police came to his house a few days later, he initially denied any involvement, but then he took them to the bayou and showed them where he threw his clothes. Defendant denied that he took any money from the victim, or that he was even aware the victim may have had a large amount of money on his person or in the house.

Cameron Snyder, who was the regional forensic pathologist with the Lafayette Parish Coroner and Forensic Facility at the time of the murder, testified as follows: He conducted the autopsy of the victim. The autopsy showed that the victim had

5

several non-life threatening lacerations, bruising, and abrasions on his head and body. He also had several stab wounds on his body, one stab wound went right through the biceps of his arm, in one side and out the other side. There were several long abrasive lacerations to the back of the victim's head and one abrasive laceration above his eye. Snyder theorized that the abrasive laceration above the eye was a blunt force injury of such force that the frontal bone was fractured, which caused bleeding inside the victim's sinus cavity. The lacerations on the head were consistent with being struck by the tire iron. There were a total of nine blows to the head, side, front, and back. There were several stab wounds to the victim's chest and each could have been fatal. There was a stab wound to the inner right chest that pierced a superior vein, a stab wound which pierced the right lung, and three stab wounds which pierced the left lung. The victim bled both internally and externally, and the extensive bleeding was the cause of his death. He theorized that it took about eight minutes for the victim to bleed-out. His examination showed that the victim was five foot and nine inches tall and weighed approximately one hundred sixty-five pounds. The victim had a blood alcohol content of 0.319, a little under four times the legal limit to operate a vehicle, and marijuana was also found in his blood analysis. However, from the amount of the marijuana in the victim's system, Snyder theorized that he had smoked the drug several hours prior to the murder.

The witness also described a large blood spot on the victim's back which appeared to be a transference from blood that had splashed on the floor. He explained that it appeared the victim died laying on his back in a puddle of blood, and then he was rolled over onto his side.

6

Testimony from family indicated that the victim may have had a large amount of cash on his person or in his house at the time of the murder. Edwina Andrepont, the victim's mother, testified as follows: The victim lived alone. He was forty-three at the time of his death. He never married and had no children. He did not work because he had been ill for several years with severe intestinal problems. Approximately a week before, she had gone with him to the bank where he withdrew nine thousand dollars from his checking account. He kept thirty-five hundred, and she took the remaining amount for safekeeping. Except for a wad of money found stuffed into the ashtray of his truck, no money was found in his house.

Ms. Andrepont testified that she ordered a recliner for the victim and was there when it was delivered to his house on Christmas Eve. When the chair was delivered, the victim asked her to pay for it out of the money that she had kept for him, so she had to go home and get the money to give to Defendant. She identified Defendant as one of the men who delivered the chair. She testified that Defendant saw the hunting trophies and that Defendant wanted to purchase a rifle from the victim. She said that the victim was left-handed and generally kept money in his left-hand pocket. Although she knew her son smoked marijuana and drank alcohol, she had not seen him do so that day.

On cross-examination, the victim's mother's recollection of the amount of money she kept from what the victim had drawn out of his account was vague. She admitted that at the time of the incident, she had told the police they had taken six thousand dollars out of the account and she had kept four thousand for safekeeping, leaving him with only two thousand dollars. The victim's sister also testified that he had at least two thousand dollars to spend for Christmas, that he was going to give,

7

or had given two of her children five hundred dollars each. She said he was ill and could not shop so he gave money for presents.

Russell Fontenot, the victim's first cousin, testified as follows: He talked to the victim on Christmas Eve, at about 8:30 p.m. He stated that the rifle had originally been his gun and that he traded it to the victim for a different gun. The victim called him that night and asked him if he wanted to buy back the rifle for fifty dollars. The victim told him that he had sold the gun, but the girlfriend of the person to whom he sold it was making him give the gun back. However, the witness did not know who the person was. Fontenot testified that the victim generally gave money away at Christmas time and that he generally kept his money in his left-hand pocket.

Phillip LeFleur's testimony essentially corroborated his father's testimony. The boy was thirteen at the time of the trial and eleven at the time of the murder. He was with Defendant when they stopped at the pawn shop, went with him to the victim's house to deliver the chair, then when went back with his father to buy the rifle. He said that the victim acted angry, but he showed them how to load the rifle. He and his father went out after and fired off a few rounds. The boy took a friend with him to test the gun. When Defendant's girlfriend came home that evening, she told Defendant she would not allow the gun in the house. The boy went back to the victim's house with his father, but stayed in the truck. He said that at one point he went up to the door and asked Defendant to hurry. He said that shortly thereafter, his father came out and said he had to go back to their house to get the bullets. The boy testified he did not see his father again until later in the night when he found his father in the bathroom, washing blood from his hands.

8

On cross-examination, the son admitted that he had not said anything to the police a few days after his father was arrested about the victim being angry at the time he and Defendant purchased the rifle. He also admitted that, when asked why his father returned the rifle, he did not tell the police it was because the girlfriend refused to have the gun in the house.

Ashley Leger, Defendant's girlfriend, testified that she did not tell Defendant he had to return the rifle. She stated that he had told her he was returning the rifle because the boy was not listening to him. At the time of the incident, she and Defendant had a seven-week-old daughter, and later, they had another daughter.

Richard Daigle, a lieutenant with the Eunice Police Department, was the lead investigator of the crime. The lieutenant described the crime scene as he found it on Christmas Day: There was a knife blade on the floor beside the victim's body. The handle was found about a half mile away from the house on the road side. A videotape made of the scene at the time of the discovery was shown to the jury. The video showed the victim on the floor, with bloody footprints around the body, in the bedroom, in the bathroom, in the kitchen, and out to the back porch area. The rifle was on an unmade bed. There were clothes all over the floor, and a drawer in a small cabinet in the living room was open. It was noted in the video that a bloody footprint was found on the sleeve of a shirt covered by another shirt suggesting that clothes were moved about in the bedroom after the murder. Finally, a plate of what appeared to be a substantial amount of marijuana, along with a baggie of the same substance, was shown on a table top in the bedroom.

9

Two forensic science experts, Christopher Henderson and George Schiro, testified that they collected and examined various items as evidence. They described the crime scene and explained where different pieces of evidence were found and the significance of the items. Most of their testimony concerned blood and tissue samples. Christopher Henderson testified that he examined Defendant's shirt and pants worn the night of the murder and later thrown into a bayou. The witness stated that there were no cuts, tears, or missing buttons on the clothing which could indicate a fight between Defendant and the victim. George Schiro testified that both the victim's DNA and Defendant's DNA were found in the victim's left-hand pocket. However, he could not determine the source of the DNA deposits or theorize how Defendant's DNA was put into the pocket.

The only direct evidence of the identity of victim's killer was from the DNA and fingerprint analyses which pointed to Defendant and which were not refuted. However, the State argues that the circumstantial evidence shows that Defendant returned to the victim's house to rob him, and during the course of the robbery bludgeoned and stabbed him. The State argues that the evidence indicates that Defendant searched the victim and the house for money. The State points to the fact that the victim's body appeared to have been rolled onto its side after he died and that the left-hand pocket appeared to have been puffed out. The State argues that the extent of the victim's injuries as compared to the lack of injury inflicted on Defendant substantiates the supposition that Defendant intended to rob the victim and that the killing was a result of that intent.

In *State v. Gant,* 06-232, pp. 7-9 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099, 1110-12, *writ denied*, 06-2529 (La. 5/4/07), 956 So.2d 599, the accused raised the

10

argument of self-defense when he was charged with second degree murder. The fifth

circuit stated:

> The evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Williams,* 05-59, p. 4 (La.App. 5 Cir. 5/31/05), 904 So.2d 830, 833. When circumstantial evidence is used to prove the commission of the offense, LSA-R.S. 15:438 mandates that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *Id.* It is not a separate test from the *Jackson* standard; rather it provides a helpful basis for determining the existence of reasonable doubt. *State v. Harrell,* 01-841, p. 5 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019. Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. *Id.* An appellate court does not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events. *State v. Williams*, 904 So.2d at 833. Rather, the reviewing court must evaluate the evidence in a light most favorable to the State, and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *Id.*

> LSA-R.S. 14:30.1(A)(1) states that second degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. In order to prove second degree murder, the State must prove the killing and that the defendant had specific intent to kill or inflict great bodily harm. *State v. Cazenave,* 00-183, p. 6 (La.App. 5 Cir. 10/31/00), 772 So.2d 854, 859, *writ denied,* 00-3297 (La.10/26/01), 799 So.2d 1151.

> Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." *Id.,* LSA-R.S. 14:10(1). The determination of specific criminal intent is a question of fact. *State v. Cazenave*, 772 So.2d at 860. Specific intent may be inferred from the circumstances and actions of the defendant, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim's injuries. *State v. Keating*, 00-51, p. 4 (La.App. 5 Cir. 10/18/00), 772 So.2d 740, 743, *writ denied,* 00-3150 (La.10/12/01), 799 So.2d 494 . . . . In addition, a defendant's flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. *State v. Cazenave*, 772 So.2d at 860.

>           . . . .

11

The relevant inquiry on appeal is whether a rational fact finder, after viewing the evidence in the light most favorable to the prosecution, could have found, beyond a reasonable doubt, that the homicide was not committed in self-defense. The determination of Defendant's culpability focuses on a two-fold inquiry, whether, from the facts presented, Defendant could reasonably have believed his life to be in imminent danger, and whether deadly force was necessary to prevent the danger. While there is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a Defendant had a reasonable belief that deadly force was necessary to avoid the danger.

*Id.,* citing *State v. Barnes*, 729 So.2d at 46. (Citations omitted).

Furthermore, LSA-R.S. 14:21 states that "[a] person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." *See also*, *State v. Cazenave*, 772 So.2d at 860.

In a case similar to this, *State v. Pagan,* 04-1478, p. 11 (La.App. 5 Cir. 5/31/05), 905 So.2d 435, 441, *writ denied,* 05-2003 (La. 2/17/06), 924 So.2d 1013, the fifth circuit held that Pagan's specific intent to kill or to inflict great bodily harm could "be inferred from the victim's extensive wounds." Moreover, the court noted that the inference of Pagan's "guilty mind" could be drawn from his behavior following the stabbing. In the current case, the evidence is insufficient to support the State's contention that Defendant returned to the victim's house with the intent to commit robbery. There was testimony that the victim may have had cash on his person, or in the house, and no money was found after the victim's body was discovered. But, as noted by Defendant, there was inconsistent testimony regarding how much money the victim had on his person or in his house at the time. Whether he had money other than the one hundred and sixty dollars found in the truck was speculation. The victim's mother and sister testified that he always kept his money in his left-hand pants pocket;

12

however, the only money found was in the ashtray of the victim's truck. Furthermore, the victim's mother testified that he told her to pay for the chair out of the money that he had given her to keep for him and she had to go home to get the money to give to Defendant for the chair. There was no indication that Defendant was aware of the fact that the victim may have had cash on his person or in the house, except for the one hundred and forty dollars he had paid for the rifle.

However, there is no need for this court to find that Defendant committed an armed robbery pursuant to La.R.S. 14:30.1(A)(2)(a). This court finds that the evidence, direct and circumstantial, was sufficient for the jury to conclude beyond a reasonable doubt that Defendant possessed the requisite intent to kill or inflict great bodily harm. The damage inflicted on the victim was extensive. According to Defendant's own testimony he bludgeoned the victim several times, and after the victim dropped the knife, he picked up the knife and stabbed him several times. At that point, Defendant became the aggressor. "A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." La.R.S. 14:21. It was the coroner's opinion that it was the knife that killed the victim, not the several blows to the head. In the present case, the jury could have reasonably found that the extensive and continuing injuries were indicative of Defendant's intent to either kill or inflict great bodily harm. Moreover, as in *Pagan*, Defendant ran away, threw away evidence, and when initially confronted, he denied his involvement, thereby exhibiting a "guilty mind." *See State v. Richards*, 06-1553 (La.App. 3 Cir. 5/2/07), 956 So.2d 160, *writ denied*, 07-1129 (La.12/14/07), ___ So.2d ___.

13

Defendant claims that he was fearful for his life when the victim attacked him with a knife, and that he was required to use deadly force to defend himself. In *Richards*, wherein the accused stabbed the victim to death and claimed self-defense, this court noted:

> In examining a claim of self-defense, it is necessary to consider: (1) whether the defendant had a reasonable belief that he was in immediate danger of death or great bodily harm; (2) whether, under circumstances such as the possibility of escape, killing was necessary to prevent that death or great bodily harm; and (3) whether the defendant was the aggressor in the conflict. *State v. Jenkins*, 98-1603 (La.App. 4 Cir. 12/29/99), 750 So.2d 366, *writ denied,* 00-556 (La.11/13/00, 773 So.2d 157).

*Id.* at 170-71.

Defendant may have had a reasonable belief that he was in immediate danger if, as he testified, the victim attacked him with a knife. However, he also testified that he entered the house armed with a tire iron because he knew the victim had been drinking and had been somewhat argumentative a short time earlier. Moreover, once the victim dropped the knife, Defendant picked it up and stabbed him several times. Defendant testified that he bit the victim twice in an effort to get him to drop the knife, but when asked, the coroner testified that he did not see a bite mark on the victim's body. While there was testimony that the victim was five feet, nine inches tall and weighed one hundred and sixty pounds, there is nothing in the record before this court to indicate the size and weight of Defendant. However, the jury had the benefit of seeing Defendant and gaging his ability to withstand a physical confrontation with the victim. Moreover, there was testimony that the victim, who was several years older than Defendant, was sickly and very drunk. Finally, as noted, the victim received extensive injuries, while Defendant received a small cut on his hand and nothing more.

14

We find no merit to the argument that the State failed to sustain its burden of proving beyond a reasonable doubt that Defendant did not kill the victim in self-defense. The State presented sufficient evidence, direct and circumstantial, to show that Defendant intended, at the least, great bodily harm, and the evidence was sufficient to negate Defendant's claim that the deadly force he used on the victim was necessary to protect himself from great bodily harm or death.

*Responsive Verdict Instruction*

For his second assignment of error, Defendant argues that the trial court erred when it read an incomplete definition of the responsive verdict of manslaughter. Therefore, Defendant asserts that the jury was not able to adequately contemplate a verdict other than second degree murder. The definition of manslaughter read to the jury was as follows:

> Manslaughter is a homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that the average person's blood would have cooled at the time the offense was committed; or

> A homicide committed without any intent to cause death or great bodily harm when the offender is engage[sic] in the perpetration or attempted perpetration or any felony other than Aggravated Burglary, Armed Robbery, First Degree Robbery, or Simple Robbery. The other felonies contemplated in manslaughter are: Aggravated Battery, Second Degree Battery or Aggravated Second Degree Battery. A felony is a crime punishable at hard labor.

According to the record, the jury sent the judge a note which read, "[P]lease provide the specific definition between Second degree Murder and Manslaughter." The trial court complied, essentially reading the same instruction verbatim to the jury.

15

A few minutes later, the jury returned a verdict of second degree murder by an unanimous vote.

Defendant argues in brief that "[a]lthough the trial court did give the book definition of second degree murder (Louisiana Revised Statute 30.1), it never defined first degree murder which was referred to in some of the definitions of manslaughter and also occasionally referred to only by the words 'Article 30'." Defendant further argues that "[t]he jury demonstrated their confusion and indecision over the appropriate level of the charges when they requested additional instructions." As noted by the State, however, Defendant was not charged with first degree murder. Therefore, there was no need to instruct the jury as to the elements of first degree murder. Moreover, a request for another reading of the definitions of second degree murder and manslaughter does not necessarily indicate the jury was confused or indecisive. The jury returned a verdict of guilty within ten minutes after the instructions were read to them again.

Finally, the record indicates that Defendant made no objection to the instruction when it was first read to the jury or when it was read to the jury the second time. Louisiana Code of Criminal Procedure Article 841(A) provides that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." Because Defendant did not object to the alleged error at trial, he is precluded from raising the error on appeal.

*Summation*

For his final assignment of error, Defendant argues that the State impermissibly argued to the jury that they should consider whether Defendant could have retreated

16

when determining whether he reasonably believed deadly force was necessary to extricate himself from the situation.

During summation, the State told the jury "[a]nd this is directly from the charges that the judge is going to give you. The possibility of avoiding the necessity of taking a life by retreat."

Defendant correctly points out that the justifiable homicide statute prohibits the finder of fact from considering "the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm." La.R.S. 14:20(D). This provision of the statute was enacted in 2006, and became effective on August 15, 2006. 2006 La.Acts No. 141, § 1. Prior to August 15, 2006, the possibility of escape was a factor to be considered in determining whether the accused had a reasonable belief that the use of deadly force was necessary. *See State v. Johnson*, 06-1263 (La.App. 3 Cir. 2/7/07), 948 So.2d 1229, *writs denied*, 07-467, (La. 10/12/07), 965 So.2d 398, 07-509 (La. 10/12/07), 965 So.2d 399. Defendant was indicted in 2004, but was tried for the offense in March 2007, eight months after the enactment of the statute.

While there may be merit to this assignment, this court will not address the issue of whether there was error when the trial court instructed the jury that the possibility of escape or retreat was a factor to consider when determining whether Defendant's belief that deadly force was reasonable and apparently necessary. Defendant never objected to the instruction, nor did Defendant object when the State mentioned the trial court's instruction during its closing argument. Therefore, Defendant is precluded

17

from raising the error. As noted above, La.Code Crim.P. art. 841 provides that absent a contemporaneous objection, an error cannot be raised on appeal.

CONCLUSION

For the foregoing reasons, Defendant's conviction and sentence are affirmed.

AFFIRMED.