905 So.2d 435 (2005)
STATE of Louisiana
v.
Michael A. PAGAN.
No. 04-KA-1478.
Court of Appeal of Louisiana, Fifth Circuit.
May 31, 2005.
*436 Paul D. Connick, District Attorney, Terry M. Boudreaux, Desiree M. Valenti, Thomas S. Block, Vincent Paciera, Jr., Assistant District Attorneys, Twenty-Fourth Judicial District Parish of Jefferson, State of Louisiana, Gretna, Louisiana, for Plaintiff/Appellee.
Jane L. Beebe, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
Panel composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY, and MARION F. EDWARDS.
MARION F. EDWARDS, Judge.
Defendant appeals his conviction for second degree murder, a violation of LSA-R.S. 14:30.1. For the following reasons, we affirm.
A Jefferson Parish Grand Jury returned an indictment against the defendant, Michael A. Pagan, for the second degree murder of Randall Dufrene in violation of LSA-R.S. 14:30.1. Pagan pled not guilty at arraignment.
On October 22, 2002, Pagan proceeded to trial before a jury of twelve persons, which found Pagan guilty as charged on October 25, 2002. On October 30, 2002, the trial court sentenced Pagan to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence, and Pagan made an oral motion *437 for appeal. A written motion for appeal followed and was granted.
Between the late-night hours on June 18, 2001 and 6:45 a.m. on June 19, 2001, the victim, Randall Dufrene, was murdered in his apartment on Lafayette Street in Gretna.
After neighbors found the victim on the evening of June 19, 2001, Gretna Police Detective Richard Russ responded to the apartment. The victim was lying on the kitchen floor in a large pool of blood with his right arm across his chest and his left arm facing up. According to Dr. Garcia, the state's expert forensic pathologist, the victim's neck was slashed and he had numerous incised, or cut, wounds on his body, including his scalp, face, torso, and arms. He also sustained several abrasions on his body. Toxicology tests revealed that the victim had ingested cocaine within two hours of his death and he had a trace amount of alcohol, .01, in his system.
Detective Russ testified that the victim was clutching a metal crack pipe in his left hand. It appeared there had been a struggle in the room. Some of the chairs were turned over and some of the cabinet doors were open. Detective Russ also found three cans of beer on the counter. A wooden-handled, serrated-edged knife was on the floor to the left of the victim. According to Dr. Garcia, this knife could have inflicted the victim's incised wounds. According to Detective Russ, there were three $20 bills in the victim's pocket.
Testimony from the victim's family and neighbors outlined the victim's activities preceding his death. Eugene Dufrene, the victim's father, testified that he saw his son for the last time on June 18, 2001 when he took his son to the bank to cash a check for $550, which represented final payment for a construction job that Mr. Dufrene and his son had completed. The victim asked for the money all in denominations of twenties. The victim kept all but $75 or $80 of the money, which he gave to his father. Between 4:00 and 4:30 p.m., Mr. Dufrene brought the victim to his apartment.
Redrick Hall, one of the victim's neighbors, testified that the last time he saw the victim was around 4:00 p.m. on June 18, 2001, when he took the victim to a bar in Harvey. After returning to the apartment complex, Hall saw a man whom Hall believed was looking for the victim. Hall said that he did not speak to the man and only saw the back of the man as the man walked by. Another neighbor, Robert Doming, saw the victim later that night at the apartment complex between 10:00 p.m. and midnight. Doming said he was taking his trash out when he saw two men walking and then saw the victim lock his apartment and walk behind them. Doming was not certain whether the victim was accompanying the two men. Another neighbor, James Hicks, was sitting outside around 10:00 p.m. when the victim came home alone. According to Hicks, the victim was joking around and in good spirits as he walked passed Hicks on the way to his apartment.
It was undisputed that the victim used crack cocaine. Hicks testified that, approximately one month before the victim's death, he saw defendant, Michael Pagan, at the victim's apartment. Hicks observed Pagan place some rock cocaine on the table and saw Pagan smoking crack a short while later. Additionally, Hall testified that Sonia Reynolds, who lived nearby, was the victim's supplier. Hall admitted that he also used crack cocaine himself.
Sonia Reynolds was incarcerated at the time of trial and admitted to several prior convictions. She testified that, at approximately 9:00 p.m. on June 18, 2001, she came to the victim's apartment. The victim *438 was with two men, whom she knew as Percy and Joe. She sold the victim between $100 and $200 of crack, and the three men smoked the crack cocaine. Reynolds said that she also smoked some crack at the victim's apartment. According to Reynolds, the victim was very generous with his crack cocaine and his money. She left and smoked some crack in her apartment. Reynolds returned to the victim's apartment twice more and sold a $20 rock and a $50 rock to the victim on each occasion. According to Reynolds, Percy and Joe only stayed about thirty minutes. When Reynolds went to the victim's apartment between 10:00 p.m. and 11:00 p.m., Pagan, whom she knew as "Big Mike," was there. The victim and Pagan were sitting at the kitchen table smoking crack. Reynolds told the victim she was going to the store for cigarettes and asked the victim if he needed anything. He replied that he wanted some cigarettes and some change. According to Reynolds, the victim pulled out a roll of money, turned away as if hiding his money, and peeled off a $20 bill. When Reynolds returned with the cigarettes, she noticed that the victim and Pagan looked high. Neither of them looked angry and they were not fighting. This was the last time Reynolds ever saw the victim alive.
About ten minutes after Reynolds left the victim's apartment, Pagan telephoned her. When Pagan asked if she could "front him something," she said she did not have any more cocaine. Five minutes later, Pagan came to her residence, asked if she could either "front him" until he got some money, walk with him to his aunt's to get money, or lend him some money. Reynolds said that she was not doing any of those things and that she was going to sleep. She also suggested to Pagan that he borrow some money from the victim.
The victim's cell phone was recovered from the scene and the phone records reflected that a telephone call was made from the cell phone to Sonia Reynolds at 3:22 a.m. on June 19, 2001. The cell phone records also indicated eight more phone calls to three other phone numbers between 3:26 a.m. and 4:00 a.m.
Pagan's aunt, Daisy Valle, testified regarding Pagan's whereabouts during the hours preceding the victim's death. Ms. Valle testified that Pagan lived with her because he was having marital problems. According to Ms. Valle, Pagan, his brother, and cousin were at her house on June 19, 2001 between 1:30 a.m. and 1:40 a.m. According to Ms. Valle, Pagan looked like he was "spaced out on something." Pagan was not bruised or cut at that time. However, when Ms. Valle saw Pagan again at 6:15 a.m., Pagan's hands were bandaged and he had blood all over the bandages. Pagan told his aunt that he had been attacked by three black men at a bar. Pagan went to a doctor on Manhattan Boulevard, who told him that he needed to go to the hospital. Ms. Valle testified that she took Pagan to West Jefferson Medical Center when she got off of work at approximately 2:45 p.m.
Detective Dana Parker of the Gretna Police Department responded to West Jefferson Medical Center at approximately 4:30 p.m. Detective Parker observed that Pagan's right thumb had a severe cut. She photographed Pagan's hands, and these photographs were admitted into evidence at trial. Pagan repeated the story of being attacked at the Gretna Tavern to Detective Parker, who went to investigate Pagan's claims. However, Detective Parker found no evidence of an altercation inside or outside of the bar. When she showed Pagan's photograph to the bartender, who was on duty from 11:45 p.m. on June 18, 2001 to 7:15 a.m. on June 19, *439 2001, the bartender said Pagan had not been in the bar.
After the victim's body was discovered on June 19, 2001, Reynolds told the police that "Big Mike" was the last person she saw with the victim. The police showed her a photographic lineup, and she identified Pagan as "Big Mike."
Around midnight on June 19, 2001, Detective Russ interviewed Pagan regarding the aggravated battery complaint that he had made. Pagan essentially repeated the story of the attack that he had told Detective Parker, with the exception of the fact that he told Detective Russ he never went inside the bar. When Detective Russ confronted Pagan with the differences between the two tales, Pagan said he wanted to stick with the version he had just told Detective Russ. Detective Russ had not mentioned the homicide investigation to Pagan at this point.
After confronting Pagan with the discrepancies in his story, he told Pagan that there was a witness, whom the detective did not name, that placed Pagan at a murder scene with the victim in the late hours of June 18 or the early hours of June 19. Pagan responded, "That crack whore, Sonia, is lying. Do you mean to tell me that if she said I killed somebody in Texas I'd be a suspect in that crime too?" Pagan was allowed to leave and was not arrested at that time.
On June 21, 2001, Pagan returned to the police department accompanied by an attorney. After waiving his rights, Pagan made a recorded statement in which he admitted that he had lied about being attacked by the three men. Pagan said he made up the story because he was afraid. Pagan said that he wanted to explain what really happened. Pagan said he went to the victim's apartment around 2:00 a.m. on June 19, 2001. They were sitting down at the kitchen table drinking beer when the victim told Pagan that he owed the victim $20. Pagan said he denied that he owed the victim any money. According to Pagan, the victim "got all wild." Pagan said that the victim stood up and then he stood up. The victim turned and grabbed a knife. The victim tried to stab him with the knife several times. Pagan said he cut his hand trying to grab the knife. Pagan said that they wrestled over the knife. According to Pagan, he was trying to take the knife away from the victim when the knife "hit" the victim in the neck and the victim fell to the floor. According to Pagan, the victim was struck in the neck only once and the victim did not continue to fight after the knife struck him in the neck.
Pagan explained that they were initially facing each other when the victim swung the knife at him. However, after they began to wrestle over the knife, Pagan grabbed the victim's hand to prevent himself from being stabbed, and the victim twisted around. The victim's back was against Pagan's chest. Pagan had his left arm wrapped around the victim and was holding the victim's right hand with his right hand. Pagan grabbed the blade of the knife and the victim's hand in an attempt to disarm the victim. Pagan said his hand was bleeding and hurting and they continued to wrestle. While Pagan was still attempting to disarm the victim, the knife cut across the victim's neck. Pagan said he could not recall exactly how the knife cut the victim's neck. Pagan said he did not realize the victim was dead because his feet were still moving. Thereafter, Pagan dropped the knife. When he looked around and saw all the blood, he ran to his mother's house, where he showered and threw his bloody clothes and shoes in the garbage. Pagan said that it was around 5:45 a.m. when he arrived at his mother's house.
*440 Pagan said that he did not know whether the victim was cut on any other place on his body. Also, Pagan could only remember the victim sustaining one injury because the struggle happened very quickly. According to Pagan, the victim "probably got hit in the arm."
Pagan later admitted in his statement that he did owe the victim money. He denied that he ever used drugs with the victim at his apartment. He initially said that the victim was only drinking with him, but later said he thought he saw that the victim was smoking crack cocaine. He acknowledged that Sonia came to the apartment, and that the victim talked to Sonia and then she left. Pagan repeatedly said that he knew what he did was wrong. Pagan denied that he took any money from the victim.
At trial, Pagan reiterated many facets of his recorded statement, including that the victim was killed during the struggle for the knife while Pagan was trying to disarm the victim. However, Pagan also contradicted the statement in certain respects at trial. Significantly, Pagan claimed at trial that the victim was smoking crack all night. Pagan also testified that the victim made telephone calls to find crack. Further, Pagan said that the fact that the victim was getting low on money was what started the fight.
The defense also called several witnesses. Pilar Serrano testified that she saw blood in the hallway on June 19, 2001. She was with the group that discovered the victim's body on the evening of June 19, 2001. Serrano stated she knew Sonia smoked crack and that she was always at the victim's apartment. However, she said she never saw the victim smoking crack. Serrano testified that the victim came to her apartment looking for Redrick Hall, with whom she resided. According to Serrano, the victim looked drunk. Pagan also called Detective Russ, who testified Serrano told him that the victim had a cocaine habit. Detective Russ also testified that Serrano told him that she had seen someone beating on the victim's door regarding money. She speculated that it was in reference to a cocaine debt.
In his lone assignment of error, Pagan contends that the evidence presented at trial was insufficient to support his conviction for second degree murder because the State failed to prove he had the specific intent to kill or to inflict great bodily harm. Pagan also contends that the State failed to prove beyond a reasonable doubt that he did not act in self-defense. The State responds that the evidence supports the jury's decision to reject the self-defense theory.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia,[1] requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt.[2] Under LSA-R.S. 15:438, "[t]he rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." However, this requirement does not establish a standard separate from the Jackson standard, but provides a helpful methodology for determining the existence *441 of reasonable doubt.[3] In assessing other possible hypotheses in circumstantial evidence cases, the appellate court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events.[4] Instead, the reviewing court evaluates the evidence in the light most favorable to the prosecution and determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under the Jackson standard.[5] When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant, that hypothesis falls and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt.[6]
To prove second degree murder, the State was required to show (1) the killing of a human being, and (2) that the defendant had the specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1(A)(1). Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Because specific intent is a state of mind, it need not be proven as a fact, but may be inferred from circumstances and actions of the accused, as well as the extent and severity of the victim's injuries.[7]
Pagan contends that the evidence was insufficient to prove that the victim was not killed accidentally and in self-defense during a struggle for the knife. However, it appears that the State met its burden of proving Pagan had the requisite intent to kill the victim and that Pagan did not act in self-defense.
Pagan's specific intent to kill or to inflict great bodily harm upon the victim can be inferred from the victim's extensive wounds. At trial, Dr. Garcia highlighted the diagram of the wounds on the autopsy report. The diagram shows approximately twenty-one wounds and three abrasions on the victim's arms, head, face, ear, and torso. Of that number, the diagram shows twelve wounds on his arms and hands that Dr. Garcia characterized a classical defensive wounds and one additional wound on his left elbow that Dr. Garcia characterized as a possible defensive wound. The remaining wounds included a long incised wound on the back of the victim's scalp, a large gaping wound to the victim's left armpit, a large gaping incised wound to the right side of his cheek, and the lethal wound that transected the victim's trachea and cut the right carotid artery.
The lethal wound stretched seven and one half inches from the victim's right ear across his neck and went all the way down to the neck bone, where one of the cervical vertebrae (C-4) was nicked. According to Dr. Garcia, the lethal wound was a "slash-type cut" and occurred after the wounds to the arm, back, and back of the scalp. Further, Dr. Garcia stated that the wounds to the right side of the victim's neck would *442 cause the victim to lose enough blood volume to result in death.
Dr. Garcia was questioned extensively on cross-examination about the victim's injuries. She discounted the possibility that the totality of the victim's wounds could have been inflicted as suggested by the defense. Dr. Garcia acknowledged that each wound alone could have been inflicted in isolation as postulated by Pagan. However, Dr. Garcia testified that the entire wound pattern was inconsistent with Pagan's theory of how the death occurred.
Additionally, we note that an inference of a "guilty mind" can be drawn from a defendant's dishonesty following the offense.[8] Herein, if Pagan's true intent was to wrest the knife from the victim, then he could have relayed that to the police. Rather, Pagan fabricated an elaborate tale about being attacked, which he then conveyed to his friends, family members, and to the police. It was several days later when, accompanied by an attorney, that Pagan went to the police and claimed that the victim had been accidentally wounded while Pagan attempted to defend himself.
The jury could also have found Pagan was not a credible witness because of the numerous discrepancies in his recorded statement itself and the discrepancies between the statement and his trial testimony. At trial, Pagan said that the victim was getting high all night and was "loaded" on crack. In the recorded statement, Pagan initially stated that the victim was only drinking beer, but later said that he thought he saw the victim smoking crack. At trial, Pagan admitted that he had smoked crack in the victim's apartment before, but denied that he had smoked crack that night. In his recorded statement, Pagan denied that he had ever used drugs with the victim at the apartment. In addition, the jury could have found Pagan was not credible because he said in his statement that he was not sure if the victim was cut anywhere other than his neck, while the crime scene photographs depict multiple, obvious injuries.
By returning the guilty verdict, the jury obviously did not believe Pagan's version of the events. It is the role of the fact-finder to weigh the credibility of the witnesses, and a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review.[9] Viewed in the light most favorable to the prosecution, we find that all of the evidence, including Pagan's dishonesty following the offense, the severity of the victim's wounds, and Dr. Garcia's testimony, was sufficient for rational jurors to conclude that Pagan specifically intended to kill or to inflict great bodily harm upon the victim.
Pagan also contends that the evidence supported a finding that the homicide was justified because he acted in self-defense. According to LSA-R.S. 14:20, a homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is imminent danger of losing *443 his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." When a defendant claims self-defense in a homicide case, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense.[10] The relevant inquiry on appeal is whether a rational fact finder, after viewing the evidence in the light most favorable to the prosecution, could have found, beyond a reasonable doubt, that the homicide was not committed in self-defense.[11] The determination of a defendant's culpability focuses on a two-fold inquiry. First, from the facts presented, could the defendant reasonably have believed his life to be in imminent danger? Second, was deadly force necessary to prevent the danger?[12] While there is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a defendant had a reasonable belief that deadly force was necessary to avoid the danger.[13]
The record shows that the State met its burden of proving the homicide was not committed in self-defense. The evidence reflects that Pagan was significantly larger and younger than the victim. The victim was forty years old, was 5'10" tall, and weighed 150 pounds at death. In contrast, Pagan was between 6'1" and 6'4" tall and weighed between 270 and 280 pounds when he was arrested. At the time of trial, Pagan was twenty-eight years old. Thus, even if Pagan reasonably believed his life was in imminent danger, the jury could have found that deadly force was not necessary in light of the fact that Pagan was so much larger than the victim.
Also, Dr. Garcia's testimony as to how the wounds occurred negated Pagan's theory of self-defense. Additionally, although Pagan testified that the victim was the aggressor, Pagan had very few injuries. The only injuries Pagan sustained were to his hands, in particular a laceration to his right thumb that required stitches, a cut on the tip of his left middle finger, and a superficial wound to the base of the right index finger. While Dr. Garcia acknowledged that these would be in the classic position of defensive wounds, Pagan came away from the fight remarkably unscathed compared to the victim, who sustained multiple injuries over his upper body, hands, and arms.
Further, Pagan did not attempt to retreat from the altercation. Pagan testified at trial that he had no chance to retreat after the victim attempted to stab him. However, Pagan acknowledged that he was sitting in the chair closest to the kitchen door and the exit to the apartment when the victim attacked him. Photographs of the kitchen and a diagram of the apartment depict no obstructions in the short distance between Pagan's chair and the exit to the kitchen. Additionally, Pagan did not attempt to render any assistance to the victim. Rather, Pagan left the victim bleeding on the kitchen floor and went to his mother's house, where he showered and discarded his clothing.
By returning the guilty verdicts, the jury obviously did not believe that Pagan acted in self-defense. After a review of the record, we find that a rational fact finder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable *444 doubt that the homicide was not committed in self-defense.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux,[14] and State v. Weiland.[15] The review revealed no errors in this case.
Accordingly, for the foregoing reasons, the defendant's conviction is affirmed.
AFFIRMED.
NOTES
[1] 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
[2] State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998).
[3] State v. Jones, 98-842 (La.App. 5 Cir. 2/10/99), 729 So.2d 57, 63.
[4] State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, 1020, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994).
[5] Id.
[6] State v. Jackson, 98-1254 (La.App. 5 Cir. 3/30/99), 733 So.2d 657, 661.
[7] State v. Keating, 00-51 (La.App. 5 Cir. 10/18/00), 772 So.2d 740, 743, writ denied, 00-3150 (La.10/12/01), 799 So.2d 494; State v. Daniels, 01-545 (La.App. 5 Cir. 11/27/01), 803 So.2d 157, 162, writ denied, 02-215 (La.11/27/02), 831 So.2d 272.
[8] See, State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 84-85, in which the supreme court found that the defendant's untruthful statement to the police was indicative of his guilty mind. The Mitchell court stated that if the defendant's true intent was for the gun to be fired into the air, defendant could have relayed that to the police when questioned. While noting that the dishonesty was not enough, alone, to convict the defendant, the Mitchell court stated that the defendant's dishonesty was admissible to show his intent as a principle to attempted first degree murder. Id. at 85.
[9] State v. Wallace, 00-1745 (La.App. 5 Cir. 5/16/01), 788 So.2d 578, 584, writ denied, 01-1849 (La.5/24/02), 816 So.2d 297.
[10] State v. Cassard, 01-931 (La.App. 5 Cir. 2/26/02), 811 So.2d 1071, 1076, writ denied, 02-0917 (La.12/19/02), 833 So.2d 327.
[11] Id.
[12] State v. T.N., 94-669 (La.App. 5 Cir. 1/18/95), 650 So.2d 288, 289-290.
[13] Id.
[14] 312 So.2d 337 (La.1975).
[15] 556 So.2d 175 (La.App. 5 Cir.1990).