EDWARD A. DUFRESNE, JR., Chief Judge.
 

 |2On December 21, 2006, the Jefferson Parish Grand Jury returned an indictment charging defendant, Pervis Williams, with one count of second degree murder in violation of LSA-R.S. 14:30.1. At the arraignment, defendant pled not guilty. On January 8, 2009, and on February 17, 2009, the trial court heard and denied defendant’s motions to suppress photo identifications.
 

 Defendant proceeded to trial before a twelve person jury on February 18 and 19, 2009. After considering the evidence presented, the jury found defendant guilty of second degree murder. On March 10, 2009, defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Defendant now appeals challenging the sufficiency of the evidence used to convict him.
 

 FACTS
 

 On October 21, 2006,17-year-old Quant-relle Barbie died from a single gunshot wound to his head. Monntrell Barbie, the victim’s younger brother, and | sLloyd Thomas both identified defendant as the shooter. Both of these eyewitnesses testified at trial.
 

 Monntrell testified that on the morning of the shooting, the victim told him that the previous night he was involved in a physical fight with defendant over a marijuana cigarette. According to Monntrell, he and his brother saw defendant the morning of the shooting and his brother and defendant exchanged “unfriendly” words. Monntrell testified that later that
 
 *133
 
 day, at approximately 11:00 a.m., as his brother was riding his bike toward him, he observed defendant come out of a high field of grass and shoot his brother. According to Monntrell, after his brother fell to the ground, defendant looked at him and then chased him with the gun and tried to shoot him, but the gun jammed. Monntrell ran to an apartment and asked to use the phone. He called 9-1-1 and told the police his brother had been shot. Monntrell then left the apartment and went to someone else’s house and laid down on the side of the bed because he was scared. Monntrell eventually returned to the scene of the shooting, talked to the police, and then went to the police station. Monntrell was shown a photographic lineup and selected defendant’s photograph as the person who shot his brother.
 

 Another witness, Lloyd Thomas, testified that he observed the shooting, which occurred at approximately 10:30 a.m. He testified that he was riding his bicycle on Lac Couture Drive when he saw someone, whom he later identified as defendant, jump out from between two apartment buildings and confront a person riding a bicycle. He testified that the victim got off the bicycle and put his hands up. He said he heard the shooter say, “What now?” He testified that defendant held a gun to the victim’s head and shot him. Mr. Thomas left the scene after defendant pointed the gun toward him. Several hours later, Mr. Thomas had someone contact the police for him. He subsequently identified defendant in a photographic lineup as the shooter.
 

 1 ,tFollowing police investigation and the positive identification of defendant by the two witnesses, defendant was arrested and charged with second degree murder.
 

 ASSIGNMENT OF ERROR NUMBER ONE
 

 On appeal, defendant challenges the sufficiency of the evidence used to convict him of second degree murder. He specifically argues that the State failed to prove his identity as the shooter.
 

 The constitutional standard for testing the sufficiency of the evidence, as enunciated in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
 
 State v. Ortiz,
 
 96-1609 (La.10/21/97), 701 So.2d 922, 930,
 
 cert. denied,
 
 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998);
 
 State v. Bailey,
 
 04-85 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 954-55,
 
 writ denied,
 
 04-1605 (La.11/15/04), 887 So.2d 476,
 
 cert. denied,
 
 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005).
 

 Under LSA-R.S. 14:30.1, second degree murder is defined as the killing of a human being when the offender 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though he has no intent to kill or to inflict great bodily harm.
 
 State v. Lewis,
 
 05-170 (La.App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90,
 
 writ denied,
 
 06-0757 (La.12/15/06), 944 So.2d 1277. In the instant case, the State proceeded under the first theory of second degree murder. As such, to prove second degree murder the State was required to prove (1) the killing of a human being, and (2) that the defendant had specific intent to kill or inflict great bodily harm.
 
 State v. Pagan,
 
 04-1478 (La.App. 5 Cir. 5/31/05), 905 So.2d 435, 441,
 
 writ denied,
 
 05-2003 (La.2/17/06), 924 So.2d 1013.
 

 |5In addition to proving the statutory elements of the charged offense at
 
 *134
 
 trial, the State is required to prove defendant’s identity as the perpetrator.
 
 State v. Draughn,
 
 05-1825 (La.1/17/07), 950 So.2d 583, 593,
 
 cert. denied,
 
 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof.
 
 State v. Ingram,
 
 04-551 (La.App. 5 Cir. 10/26/04), 888 So.2d 923, 926.
 

 In the present case, defendant does not argue that the State failed to establish any of the essential statutory elements of his conviction, but rather contends the State failed to prove beyond a reasonable doubt his identity as the offender. Defendant specifically argues that he could not have been the shooter because he was at home asleep at the time of the incident and further he had a cast on his right arm at the time, making it physically impossible for him to pull the trigger of a gun.
 

 To support his alibi that he was asleep, defendant presented the testimony of his sister Charlene Williams. She testified that at the time of the incident she lived with her mother and defendant about a block and a half from where the murder occurred. She stated that on October 21, 2006, she had plans to go to Donaldsonville for a family gathering and defendant had intended on going with her. However, when she was ready to leave, defendant was still asleep. After refusing to wait for him, she left her home between 11:30 and 11:45 a.m.
 

 At trial, defendant testified in his own behalf. He denied killing the victim and claimed, in accordance with the testimony of his sister, that he was asleep at his home on the morning of October 21, 2006, at 11:30 a.m. He stated he was supposed to go to Donaldsonville with his sister that day, but had overslept. He stated that he finally got up between 1:30 and 2:00 p.m. and that his mother was home when he awoke.
 

 | sin contrast to this alibi evidence, the State presented the testimony of two eyewitnesses who identified defendant as the shooter. Monntrell testified that he was a few feet from the shooter and was positive that defendant shot his brother. He testified that defendant was the shooter and chased him with a gun. Monntrell testified that he could never forget the face of the man who shot his brother, and that he knew defendant from the neighborhood.
 
 [1]
 

 Mr. Thomas testified that he was approximately ten or fifteen feet away from the shooting. He testified that he was positive defendant was the shooter. Mr. Thomas testified that although he did not know defendant’s name, he knew defendant from previously playing basketball with him.
 

 Moreover, Detective Roger Gorumba of the Jefferson Parish Sheriffs Office testified that both Monntrell and Mr. Thomas identified defendant as the shooter in photographic lineups. He explained that both witnesses were familiar with defendant from the neighborhood prior to the shooting. Detective Gorumba testified that he did not suggest the shooter to them or tell them they had to make an identification. He also denied threatening or coercing them to make the identifications.
 

 In further support of his theory of mis-identification, defendant argues that it was physically impossible for him to have shot the victim because his right hand was broken and in a cast. Defendant presented testimony that he was unable to use his right hand at the time of the incident.
 
 *135
 
 Defendant’s sister testified that in September of 2006, defendant, who was right-handed, broke his right hand. She explained that defendant had a hard cast on his arm that went from his fingertips to above his elbow. She stated that each of defendant’s fingers had its own slot with only his fingertips showing. She testified that defendant could not bend his fingers and that he could not write.
 

 17Pefendant testified that he was right-handed and broke his right hand on September 15, 2006, because he got into a fight while playing basketball. He testified that he had a cast from above his elbow to the tip of his hand, with only his fingertips exposed. He testified that the cast was removed while he was in jail and that he had written a “sick call to medical” to alert them that the cast needed to come off. He testified that he wrote it with his left hand because he could not write with his right hand due to the east. Defendant also testified that he initialed the waiver of rights form with his left hand and did not sign his name because he could not write. Further, he testified that he was unable to hold a gun in his right hand because the cast extended from the top of his elbow to his fingertips. At trial, defendant showed the jury his fingers and how he could not straighten his fingers completely.
 

 Further, the parties stipulated to the testimony of Dr. Charles Stevens that defendant’s right hand had a complete transverse fracture involving the mid-shaft of the second metacarpal with mild distraction and angulation.
 

 In contrast to defendant’s allegation that he could not use his right hand, the State presented the testimony of Captain Thornton, who testified that defendant had a cast but was still able to put the pen in his hand and author his initials on the waiver of rights form. Captain Thornton stated that defendant did not express difficulty in holding the pen and putting his initials and that he did not express a reluctance to ■writing. He testified that defendant was right-handed and that he did not notice any restriction in the way defendant conducted his right hand. He testified that he asked defendant to sign the rights form, but that instead of his signature defendant wrote his initials.
 

 Moreover, Mr. Thomas testified that the shooter had a cast that allowed his fingers to move. He testified that defendant was able to use his trigger finger on the morning of the shooting and that he saw defendant shoot the gun despite the | Scast. He testified that he saw defendant’s fingers move and that he was gripping the pistol. Detective Gorumba testified that Mr. Thomas told him the shooter held the gun in his right hand.
 

 Monntrell testified that defendant had a cast on his arm on the day of the shooting, but he could not recall which arm the cast was on. He then remembered that he told the police that he thought defendant’s cast was on his left arm. Monntrell was asked what would he say if defendant had a cast on his right arm and was right-handed and claimed he could not do the shooting that way. Monntrell responded, “I know it was him that did it.”
 

 Although defendant claimed he could not have been the shooter because he was asleep at the time and had a broken hand, the jury chose to believe the two eyewitnesses who testified that they saw defendant, whom they knew prior to the incident, shoot the victim while wearing a cast. Positive identification by only one witness is sufficient to support a conviction.
 
 State v. Harris,
 
 07-124 (La.App. 5 Cir. 9/25/07), 968 So.2d 187, 193.
 

 In support of his insufficiency claim, defendant further attacks the credibility of the State’s witnesses and makes refer-
 
 *136
 
 enees to discrepancies in their testimonies. We acknowledge some inconsistencies in the testimony. Mr. Thomas testified that he was approximately ten or fifteen feet away from the shooting whereas in his statement to Detective Gorumba he claimed that he was fifteen to twenty feet away. Also, Mr. Thomas recalled telling the police that the shooter shot the victim at pointblank range whereas the autopsy report reflected the victim died of a distant gunshot wound. Mr. Thomas told the police there was one gunshot, while Monnt-rell recalled telling the police that he heard two gunshots. There were also discrepancies in the testimony regarding where defendant emerged from prior to the shooting and also who was present at the time of the shooting.
 

 [ 9The jury heard all the inconsistencies in the evidence presented and obviously found the State’s witnesses more credible than the defense witnesses. The credibility of witnesses presenting conflicting testimony on factual matters is within the sound discretion of the trier of fact. The trier of fact shall evaluate the witnesses’ credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. It is not the function of the appellate court to second-guess the credibility of witnesses as determined by the trier of fact or to reweigh the evidence absent impingement on the fundamental due process of law.
 
 State v. Jones,
 
 08-20 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240. The jury was presented with all of the evidence and obviously rejected defendant’s theory that he was not the person who killed the victim.
 

 Viewing the evidence in a light most favorable to the prosecution, we find that a rational trier of fact could have found that the State proved beyond a reasonable doubt the essential elements of the crime, including defendant’s identity as the perpetrator of the offense. Accordingly, the arguments raised by defendant in this assigned error are without merit.
 

 ERROR PATENT DISCUSSION
 

 The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920;
 
 State v. Oliveaux,
 
 312 So.2d 337 (La.1975);
 
 State v. Weiland,
 
 556 So.2d 175 (La.App. 5 Cir.1990). Our review reveals a discrepancy in the commitment and transcript regarding the trial court’s advisal of the prescriptive period for filing post-conviction relief. Although the commitment reflects defendant was properly advised of the prescriptive period for filing post-conviction relief, the transcript reflects an incomplete advisal. The transcript reflects that the trial judge advised defendant he had “two years from the date the conviction becomes final within which to seek Post Conviction Relief.” This Court has held that the failure to advise a defendant that the prescriptive period runs from the time his
 
 conviction
 
 |
 
 10and, sentence
 
 become final is incomplete.
 
 State v. Grant,
 
 04-341 (La.App. 5 Cir. 10/26/04), 887 So.2d 596, 598. In accord with
 
 State v. Neely,
 
 08-707 (La.App. 5 Cir. 12/16/08), 3 So.3d 532, 538,
 
 writ denied,
 
 09-0248 (La.10/30/09), 21 So.3d 272, and
 
 State v. Davenport,
 
 08-463 (La.App. 5 Cir. 11/25/08), 2 So.3d 445, 451,
 
 writ denied,
 
 09-0158 (La.10/16/09), 19 So.3d 473, we advise defendant by this opinion that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of LSA-C.Cr.P. arts. 914 or 922.
 

 Accordingly, for the reasons set forth herein, we affirm defendant’s conviction and sentence.
 

 
 *137
 

 CONVICTION AND SENTENCE AFFIRMED.
 

 [1]
 

 . Monntrell testified that defendant was known around the neighborhood as ''Diddy.” However, defendant denied that his nickname was "Diddy.”