MARION F. EDWARDS, Chief Judge.
Defendant/appeIlant, Demond Tanner a/k/a Julien Brice (“Tanner”), appeals his conviction and sentence on the charge of the second degree murder of Kevin Chambers in violation of La. R.S. 14:30.1. We affirm both the conviction and sentence.
Tanner was charged with the murder by Grand Jury Indictment and entered a plea of not guilty at arraignment. In due course, Tanner was tried by a jury and found guilty as charged. A subsequent motion for new trial was filed and denied, after which Tanner was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Tanner filed a timely motion for appeal that was granted by the trial court.
Tanner filed a second motion for new trial based on newly discovered evidence after the appeal was granted. Because the trial court did not rule on that motion, Tanner filed a motion to remand the matter to the trial court for a hearing on that motion. This Court granted that motion and took the matter off the docket of this Court.
The trial court heard and denied the second motion for new trial, and the matter is now back before this Court on original appeal.

FACTS

Sergeant Eddie Kline of the Jefferson Parish Sheriffs Office testified that, in August of 2002, he conducted a criminal in *391 vestigation regarding Tanner. . In the course of that investigation, Sergeant Kline interviewed Kevin Chambers (“Chambers”). That interview was taped by police officers and later led to Tanner’s arrest and guilty plea on a firearm violation in April of 2004. Tanner was sentenced to a term of seven years at hard labor. Due to a diminution of sentence, Tanner was released early on December 17, 2006 and placed on parole.
On November 29, 2007, Tanner went to the home of his long time neighbor, Randolph Johnson (“Johnson”). Tanner had three other men, including Chambers, with him at the time. The four men stayed at Johnson’s home for a while then left in Tanner’s tan Dodge Neon. Later that evening, Tanner returned with only Chambers. Tanner told Johnson that he (Tanner) was intoxicated and could not drive. Tanner asked Johnson to drive him and Chambers home. Johnson did not know who Chambers was or where he lived, so he drove according to Tanner’s directions. During the drive Johnson heard Tanner and Chambers talking about hiding drugs. Johnson became upset and confronted the two men, telling them that he resented being put in this situation and was going to drive back to his home. Tanner convinced Johnson to continue driving to bring Chambers home. Tanner indicated a home on Ocean Drive in Gretna, and Johnson pulled over to the curb. Tanner got out of the car, but then he came back, and Chambers got out of the car. Tanner and Chambers walked around to the back of the house. At that point, Johnson heard Tanner say, “[Y]ou ratted me out.” Then Johnson heard two gunshots. When Tanner came back to the car he was holding a revolver. Tanner asked Johnson if he saw anything. Johnson indicated that he did not and then drove back to his home. Johnson did not report the incident to police because he was afraid of Tanner’s retaliation.
Johnson admitted that he had originally been arrested for Chambers’ murder and obstruction of justice, but he was released after the investigation was complete. Johnson stated that he was actually relieved when he was arrested and also learned Tanner was arrested because now the true story could be told without fear. Johnson stated that he spoke to Tanner while the two were incarcerated, and Tanner told him that if he could find out who “ratted” on the two of them, he could take care of things.
The State presented evidence that Tanner signed a rental agreement for a gold Dodge Neon on November 28, 2007 from Nifty Rental Car Company. In conjunction with that testimony, the State introduced a document reflecting the transaction that is signed by Tanner.
Investigators from the Gretna Police Department investigated the crime after receiving calls reporting gunshots. Upon arrival at the location on Ocean Drive, officers found the victim in a ditch, with two bullet wounds to the head. There was drug paraphernalia, but no identification on the victim and no physical evidence collected at the scene. Officers subsequently learned the victim was Chambers and began investigating by talking to Chambers’ associates. In the course of that investigation, several possible suspects were identified, and a background search was done on each of these suspects. One of the subjects was Brandon Brown (“Brown”), who was murdered a few days after the Chambers’ murder.
When officers first approached Tanner’s wife, Bianca Hansen, she was uncooperative. Officers continued to investigate the case and collect evidence. On May 7, 2008, Ms. Hansen came to the Jefferson Parish Sheriffs Office and gave *392 officers information that led to the arrests of Tanner and Johnson.
Omega Johnson, Johnson’s uncle, testified that he was invited to Tanner’s home on Christmas day in 2007. At that time, Tanner showed Omega Johnson a folder with some paperwork that contained statements made to police officers by Chambers in a prior criminal proceeding against Tanner. Tanner told Omega Johnson that he killed Chambers because of Chambers’ involvement in the prior case. Tanner disclosed the details of the murder to Omega Johnson and tried to justify the killing when Omega Johnson seemed shocked. Omega Johnson did not report the murder to police for fear that Tanner would kill him also.
After the State rested its case, Dustin Jordan (“Jordan”) testified for the defense that, on November 29, 2007, he met Kevin Chambers, the victim, that day about 6:00 p.m. in Harvey. Chambers told Jordan he had a “little hustle” to take care of and asked Jordan to drop him off. Jordan subsequently dropped off Chambers at the Casey Jones parking lot in Gretna. Jordan claimed Brandon Brown was there when he dropped off the victim. Afterward, Jordan left.
David Washington (“Washington”) testified for the defense that, on November 29, 2007, he was released from jail to house arrest. He indicated that he knew Brown well. Washington testified that he told police that Brown was the one who killed the victim. He claimed that Brown told him he killed the victim because the victim was trying to steal cocaine from him. Washington asserted that the victim more than likely owed money to Brown.
On cross-examination, Washington testified that he did not recall telling the police that Brown would not have killed the victim because Brown was a coward, and it made no sense for Brown to kill the victim for a small amount of money. Washington admitted that he had two or three convictions for drug possession.
The State and the defense stipulated that, if Cheston Isom (“Isom”) were called to testify, he would testify that Chambers “cooked” cocaine for Brown and Isom; that Brown told Isom that Chambers was trying to cheat him and that Brown was going to kill Chambers; that Isom told Washington about the murder; and that Isom and Washington were cousins.
The State called several witnesses in rebuttal, including Detective Russ and Terry Graffeo. Detective Russ testified that, in May of 2008, at Hunt Correctional Center, Jordan stated that he misled Detective Russ; that there was a person who informed Jordan that Brown’s name came up during the investigation; and that Jordan was instructed to provide Brown’s name if he ever spoke to the police. Detective Russ further testified that Jordan acknowledged that he dropped Chambers off an hour before his death, but Jordan never said he dropped Chambers off to Brown. When asked why he lied, Jordan said he “played them” and that Chambers was nothing but a “snitch” and a “rat.”
Terry Graffeo testified for the State in rebuttal that, when they interviewed Jordan in April, Jordan mentioned that he met with Washington while at the Jefferson Parish Correctional Center; that Washington told him the police questioned him about the homicide; and that Jordan was told to use the name “Brown” and to “use it up.” Graffeo further testified that Jordan said he dropped Chambers off at the parking lot; that the Chambers got out and walked across Stumpf Boulevard; and that Jordan then lost sight of the victim and drove off.

LAW AND ANALYSIS

Both defense counsel and Tanner have filed briefs. The only issue on review *393 in both is whether the evidence presented by the State is sufficient to convict Tanner of the crime.
Tanner argues that the evidence was insufficient to support his second degree murder conviction as the State failed to prove his identity as the perpetrator. He contends that the testimony of Johnson and Omega Johnson, the State’s witnesses, was not credible, and their statements and testimony contradicted one another. Tanner asserts that Brown Wiled Chambers and that the defense witnesses who testified as such were credible and should have been believed.
The State responds that the evidence, when viewed in the light most favorable to the State, was sufficient to negate all reasonable probability of misidentification. The State further responds the jury found the State’s witnesses to be more credible than the defense witnesses, and the credibility of the witnesses should not be reweighed on appeal.
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt.[1]
In cases involving circumstantial evidence, the trial court must instruct the jury that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.”[2] The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.[3]
In the instant case, Tanner was convicted of second degree murder which is defined as the Wiling of a human being when the offender: (1) has specific intent to Wll or to inflict great bodily harm; or (2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though he has no intent to Wll or to inflict great bodily harm.[4]
The State proceeded under the first theory of second degree murder. As such, in order to prove second degree murder, the State was required to prove: (1) the killing of a human being; and (2) that the defendant had specific intent to Wll or inflict great bodily harm.[5] In addition to proving the statutory elements of the charged offense at trial, the State is required to prove defendant’s identity as the perpetrator.[6]
*394 Where the key issue is identification, the State is required to negate any reasonable probability of misidentification.[7] Positive identification by one witness is sufficient to support a conviction.[8] Here, Tanner does not claim that the State failed to prove the essential elements of the crime; rather, he contends that the State did not prove his identity as the perpetrator.
At trial, the State presented witnesses, Johnson and Omega Johnson, to prove that Tanner killed Chambers. The defense, on the other hand, presented the testimony of witnesses to prove that Brown killed Chambers.
The arguments presented involve the credibility of witnesses. The credibility of witnesses is within the sound discretion of the trier of fact.[9] Clearly, the jury found the State’s witnesses to be more credible. It is not the function of the appellate court to second-guess the credibility of witnesses as determined by the trier of fact or to reweigh the evidence absent impingement on the fundamental due process of law.[10] Viewing the evidence in a light most favorable to the State, we find the State sufficiently negated all reasonable probability of misidentifi-cation and sufficiently proved Tanner’s identity as the perpetrator of the offense. Accordingly, we find no merit in this assignment of error and we affirm the conviction and sentence of Tanner.

AFFIRMED

. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).

. La. R.S. 15:438.

. State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83; State v. Washington, 03-1135 (La.App. 5 Cir. 1/27/04), 866 So.2d 973, 977.

. See, La. R.S. 14:30.1; State v. Lewis, 05-170 (La.App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, writ denied, 06-0757 (La.12/15/06), 944 So.2d 1277.

. State v. Pagan, 04-1478 (La.App. 5 Cir. 5/31/05), 905 So.2d 435, 441, writ denied, 05-2003 (La.2/17/06), 924 So.2d 1013.

. State v. Draughn, 05-1825 (La.1/17/07), 950 So.2d 583, 593, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007); State v. Ingram, 04-551 (La.App. 5 Cir. 10/26/04), 888 So.2d 923, 926.

. Draughn, supra.

. State v. Harris, 07-124 (La.App. 5 Cir. 9/25/07), 968 So.2d 187, 193.

. State v. Jones, 08-20 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240.

. Id.